Holmes-Darst Coal Corporation v. Commissioner.
Holmes-Darst Coal Corp. v. Commissioner
Docket Nos. 15529, 22276.
United States Tax Court
1952 Tax Ct. Memo LEXIS 332; 11 T.C.M. (CCH) 122; T.C.M. (RIA) 52035; February 5, 1952
*332 Held: (1) The amounts allowed by respondent as additions to petitioner's reserve for bad debts for the respective years 1942, 1943, 1944 and 1945 are reasonable and proper. (2) Petitioner's long-established method of depreciating its automobiles, used by its salesmen, on a useful-life basis of 3 1/3 years is sustained for the taxable years 1942, 1943 and 1944. (3) Petitioner has failed to establish that it sustained a deductible loss in 1944 upon the alleged sale of a coal yard in Johnson City, Tennessee. (4) Petitioner sustained a capital loss on the sale of an account receivable, a capital asset, deductible to the extent provided in section 117 (d) (1), I.R.C.
*333 Geo. E. H. Goodner, Esq., Munsey Bldg., Washington, D.C., for the petitioner. William W. Oliver, Esq., and Frank M. Thompson, Jr., Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: In Docket No. 15529, petitioner seeks a redetermination of deficiencies for the years 1942, 1943 and 1944, as follows: Declared Value
Excess-Profits
Year
Excess-Profits Tax
Tax
1942
$1,084.90
$15,296.23
1943
5,657.31
1944
1,139.15
43,373.73
In Docket No. 22276, petitioner seeks a redetermination of deficiencies in income and excess-profits taxes for the year 1945 in the amounts of $2,310.74 and $12,361.57, respectively. In Docket No. 22276, the respondent requests an increased deficiency which will result if any adjustments are made in the depreciation allowed for the years 1942, 1943 and 1944, which are in issue in Docket No. 15529. The cases were consolidated. The issues are: 1. Whether petitioner is entitled to increase its reserve for bad debts for the respective years 1942, 1943, 1944 and 1945, by the respective amounts of $13,884.47, $1,401.06, $23,539.99 and $22,219.57, disallowed by respondent. 2. *334 Whether petitioner is entitled to depreciation upon its automobiles at a rate faster than 20 per cent as allowed by the respondent for the years 1942, 1943 and 1944. 3. Whether petitioner sustained any loss in 1944 upon the alleged sale of a coal yard in Johnson City, Tennessee. 4. Whether petitioner sustained any loss in 1944 upon the alleged sale of a certain account receivable. 5. Whether petitioner is entitled to have the final decision in this case held in abeyance pending the determination of its excess-profits credit carry-back, if any, from 1946. Findings of Fact Petitioner is a corporation organized in 1933, with its principal office at Knoxville, Tennessee. It is engaged in the business of selling coal on commission for various mines. It keeps its books and files its tax returns by calendar year on the accrual basis. All of petitioner's returns for the periods involved were filed with the collector of internal revenue for the district of Tennessee. In carrying on its business, petitioner contracts, as exclusive sales agent, to sell the entire output of coal mines. Petitioner agrees to sell all such coal at a guaranteed minimum price. Its customers range from two-carload-a-year *335 dealers to those buying very much more. It sells nothing less than carload lots. All sales are made on credit with payments due on the 10th of the month following shipment. The burden of any loss on coal sold is borne by petitioner. The Bewley-Darst Coal Co. was organized in 1910 and was the predecessor of the Holmes-Darst Coal Co., which was organized in 1926. By 1933 the insolvent stockholders of the latter company, for many of whom the solvent stockholders were endorsers, had incurred debts which had to be paid. In order to clear up these financial difficulties, the Holmes-Darst Coal Co. was liquidated. The insolvent stockholders dropped out and the remaining stockholders organized petitioner to carry on the business. The business conducted, the operators dealt with and the territory covered were substantially the same. The officers and board of directors of the Holmes-Darst Coal Co. and petitioner were the same in 1933 and 1934. For the years 1942 through 1945, petitioner's tax returns disclosed taxes to be due by years, types and in amounts as follows: Declared Value
Excess-Profits
Year
Income Tax
Excess-Profits Tax
Tax
1942 (as amended)
$5,352.27
$417.82
$67,198.09
1943
5,521.76
36,266.72
1944
7,764.58
28,634.95
1945
5,171.81
*336 Issue 1 Facts The Bewley-Darst Coal Co. charged off bad debts to profit and loss as they occurred. The Holmes-Darst Coal Co. set up a reserve to take care of bad debts, and petitioner has continued that method since its organization in 1933. For the years 1942, 1943, 1944 and 1945 petitioner made additions to its reserve for bad debts in the amounts of $19,742.57, $19,330.76, $23,539.99 and $22,219.57, respectively. Petitioner deducted such amounts in computing its net income for those years. The respondent disallowed $13,884.47 of the addition for 1942, $1,401.06 for 1943, and all the 1944 and 1945 additions. Prior to the issuance of the deficiency notices herein, the respondent had never questioned the practice of petitioner with respect to its reserve method of accounting for bad debts, and had made no change in the reserve for bad debts or with respect to any items entering into those accounts. The amounts to be added to the reserve were determined by Lillias Ropp, who has been assistant treasurer and credit manager of petitioner since its organization. She held the same position and performed the same duties with the Holmes-Darst Coal Co. She was also connected with *337 the Bewley-Darst Coal Co. from its beginning, first as bookkeeper, handling all of the accounts receivable, aging the accounts and keeping a list of past-due accounts. From 1916 or 1917 until that company was discontinued, she was responsible for all credits, passed on all orders, made all collections and disbursements, and determined when an account was uncollectible and when it should be written off. She performed these duties for the Holmes-Darst Coal Co. and for petitioner. She had absolute control over their accounts and credits, and her decisions were always final. When a salesman sends in an order, Lillias Ropp determines whether the customer is worthy of credit and how much. It is her duty to collect accounts, and when she determines an account to be doubtful it is taken from the active file and placed on account called "Doubtful Accounts," where it is kept until finally settled. Ordinarily when an account becomes four or five months past due and there is no indication of the customer's being able to pay, the account is transferred to "Doubtful Accounts." Any recovery is credited to "Doubtful Accounts" and the remainder is then charged to the reserve for bad debts. The *338 output of the mines sometimes consists of as many as 10 different grades of coal. Some grades or sizes are more easily sold than others. Block coal moves more freely in the winter but it is hard to sell in the summer, as dealers do not want to pay for it and carry it until the next winter. It is impossible to carry the undesirable coal until it is in demand, and at times petitioner must take a little extra credit risk to move the entire output. If a mine has more than one half its railroad car rating in unconsigned coal, the mine can not operate the next day. During the taxable years 1942 to 1945, inclusive, a seller's market existed for coal, and the ability of petitioner to select good credit risks was better than usual. In passing on credits and accounts, Lillias Ropp uses the services of Dun and Bradstreet, consults other coal shippers, and reads various industrial and business journals, such as the New York Times, Journal of Commerce, Wall Street Journal and the Kiplinger Letter. Petitioner is a member of the National Fuel Credit Association, which is made up of 200 to 225 coal shippers. Through this organization, Lillias Ropp meets treasurers and credit managers of other shippers *339 and exchanges confidential information regarding collections and accounts. When the Holmes-Darst Coal Co. first set up its reserve for bad debts in 1926, Lillias Ropp determined that four tenths of one per cent of the gross sales was a reasonable addition to the reserve. In arriving at such percentage she considered the experience of the Bewley-Darst Coal Co. for the prior 16 years. Conferences were then had with competitors and she was informed that some of them were setting up reserves of a little in excess of four tenths of one per cent and some a little less. The proposed percentage was discussed with and affirmed by the officers and directors of the company. Ever since petitioner set up its reserve for bad debts, it has taken into consideration the experience of its predecessors, plus its own experience from its origin to the time the addition to its reserve was to be made, in determining the amount to be added to the reserve. Lillias Ropp has tried to foresee the future in determining the bad debt reserve each year, upon the theory that such a reserve should be built up in good years so that there will be money to take care of losses from future bad debts. During the taxable *340 years involved, petitioner set up and deducted the reserve for bad debts in the same way and applied the same tests as it had in the past in arriving at the amount of reserve to be set up. After the reserve percentage was determined, the only time petitioner varied from such percentage was in 1935, when it had heavy losses and the directors authorized that an additional $20,000 be placed in the reserve because losses exceeded the reserve at that time. For the years 1936, 1937 and 1938 the percentage charge to the reserve was increased from four tenths of one per cent to three fourths of one per cent. It then dropped back to four tenths of one per cent and has not varied since. The total sales, accounts charged off less recoveries and the percentage of accounts charged off less recoveries to total sales for petitioner and its predecessors from 1910 to 1945, inclusive, are by years as follows: (1)
(2)
(3)
Accounts Charged
Year
Off Less
% of Col.2
End
Total Sales
Recoveries
to Col. 1
Bewley-Darst Coal Co. 3/31
1910
$ 440,588.44
$ 58.71
.0001332
1911
754,313.90
1,322.33
.0017530
1912
838,189.54
2,619.13
.0031247
1913
996,114.83
4,615.13
.0046331
1914
950,940.56
4,522.44
.0047557
1915
971,319.68
3,240.23
.0033339
1916
1,041,618.69
5,788.59
.00555730
1917
2,278,636.33
6,270.45
.00275184
1918
2,915,535.43
11,060.60
.00379367
1919
2,209,448.07
768.78
.00034795
1920
3,044,729.08
5,277.06
.00173317
1921
3,958,474.20
184,129.95
.04651538
(9 Mo.) 3/21/21 to 12/31
2,397,549.44
107,777.40
.04495315
End 12/31
1922
4,629,779.25
78,506.33
.01695681
1923
3,823,389.21
40,239.04
.01052444
1924
2,482,576.34
7,148.00
.00287926
1925
2,725,179.50
20,766.13
.00762009
to 11/1/1926
2,731,370.33
32,490.81
.01189542
Holmes-Darst Coal Co. 11/1/1926 to 12/31/1926
1,419,859.66
None
None
1927
5,340,639.68
2,532.01
.00047359
1928
4,967,099.84
14,156.33
.00285001
1929
4,521,261.21
11,160.46
.00246843
1930
3,028,136.54
37,884.16
.01251071
1931
2,310,260.24
13,284.55
.00575023
1932
1,281,456.12
16,232.68
.01266737
1/1/33 to 4/1
(3 Mo.) 1933
286,744.48
14,233.36
.0496377
Holmes-Darst Coal Corp. 4/1/33 to 12/31/1933
1,173,330.24
263.75
.00022478
1934
1,898,834.70
290.77
.00015313
1935
2,412,617.52
36,252.47
.01502619
1936
3,035,866.98
26,335.33
.00867473
1937
3,267,280.48
22,623.84
.00692436
1938
2,651,239.33
23,291.46
.00878512
1939
2,651,849.30
9,811.24
.00369997
1940
3,205,681.25
13,550.65
.00422707
1941
3,987,233.81
15,994.99
.00401155
1942
4,865,763.84
9,736.75
.0020011
1943
4,769,606.45
15,744.16
.0033009
1944
5,826,192.12
1,390.92
.0002387
1945
5,511,002.52
345.12
.0000626
*341 The total sales, accounts charged off less recoveries, additions to reserve, and accumulated reserve of petitioner since its origin, April 1, 1933 to December 31, 1945, inclusive, by years, are as follows: Accts. Chg'd
Addition To
Accumulated
Year
Off Less
Reserve
Reserve End
Ending
Total Sales
Recoveries
For Year
Of Year
4/1/33 to
12/31/33
$ 1,173,330.24
$ 263.75
$ 4,785.97
$ 4,522.22
1934
1,898,834.70
290.77
7,785.30
12,016.75
1935
2,412,617.52
36,252.47
29,739.95
5,504.23
1936
3,035,866.98
26,335.33
23,426.85
2,595.75
1937
3,267,280.48
22,623.84
25,227.87
5,199.78
1938
2,651,239.33
23,291.46
20,565.13
2,473.45
1939
2,651,849.30
9,811.24
10,973.96
3,636.17
1940
3,205,681.25
13,550.65
13,254.90
3,340.42
Total to
12/31/40
20,296,699.80
132,419.51
135,759.93
1941
3,987,233.81
15,994.99
16,157.18
3,502.61
Total to
12/31/41
24,283,933.61
148,414.50
151,917.11
1942
4,865,763.84
9,736.75
19,742.57
13,508.43
Total to
12/31/42
29,149,697.45
158,151.25
171,659.68
1943
4,769,606.45
15,744.16
19,330.76
17,095.03
Total to
12/31/43
33,919,303.90
173,895.41
190,990.44
1944
5,826,192.12
1,390.92
23,539.99
39,244.10
Total to
12/31/44
39,745,496.02
175,286.33
214,530.43
1945
5,511,002.52
345.12
22,219.57
61,118.55
Total to
12/31/45
45,256,498.54
175,631.45
236,750.00
*342 The accounts receivable (net), accumulated reserve for bad debts, accounts receivable (gross), notes receivable, aggregate receivables and per cent of accumulated reserve to aggregate receivables for petitioner at the end of each of the calendar years from 1933, when it was incorporated, through 1945, are as follows: Accounts
Accumulated
Accounts
Receivable
Reserve End
Receivable
Notes
Aggregate
Year
(Net)
of Year
(Gross)
Receivable
Receivables
1933
$ 200,730.73
$ 4,522$22
$ 205,252.95
$ 100.00
$ 205,352.95
1934
267,678.12
12,016.75
279,694.87
None
279,694.87
1935
481,197.38
5,504.23
486,701.61
45,967.49
532,669.10
1936
529,267.00
2,595.75
531,862.75
18,575.84
550,438.59
1937
546,537.60
5,199.78
551,737.38
6,875.84
558,613.22
1938
471,839.83
2,473.45
474,313.28
26,860.56
501,173.84
1939
475,037.73
3,636.17
478,673.90
14,356.36
493,030.26
1940
466,004.10
3,340.42
469,344.52
48,860.33
518,204.85
1941
490,819.62
3,502.61
494,322.23
46,088.32
540,410.55
1942
407,440.76
13,508.43
420,949.10
15,062.99
436,012.18
1943
480,371.66
17,095.03
497,466.69
22,640.00
520,106.69
1944
423,229.97
39,244.10
462,474.07
21,540.00
484,014.07
1945
510,147.88
61,118.55
571,266.43
15,000.00
586,266.43
Totals
$5,750,302.38
$5,924,059.87
$281,927.73
$6,205,987.60
*343 Per Cent of
Accumulated
Reserve End
of Year to
Aggregate
Year
Receivables
1933
2.20217%
1934
4.29638%
1935
1.03333%
1936
.48158%
1937
.93084%
1938
.49353%
1939
.73751%
1940
.64461%
1941
.64814%
1942
3.09818%
1943
3.28683%
1944
8.10805%
1945
10.42505%
The number of commercial and industrial failures in this country and their liabilities for the year 1932 and the years 1936 to 1949, inclusive, are set forth in the following schedule: Liabilities
No.
in
Business
Million
Year
Failures
Dollars
1932
31,882
928.3
1936
9,607
203.2
1937
9,490
183.3
1938
12,836
246.5
1939
14,768
182.5
1940
13,619
166.7
1941
11,848
136.1
1942
9,405
100.8
1943
3,221
45.3
1944
1,222
31.7
1945
809
30.2
1946
1,129
67.3
1947
3,474
204.6
1948
5,250
234.6
1949
9,246
308.1
Issue 2 Facts Petitioner's equipment during the taxable years involved consisted of automobiles, office equipment and fixtures. The depreciation taken by petitioner on its automobiles and reported on its tax returns, and the depreciation allowed by respondent are as follows: Depre-
Depre-
ciation
ciation
taken by
allowed by
petitioner
respondent
Year
(30%)
(20%)
Difference
1942
$4,865.27
$3,252.98
$1,612.29
1943
4,877.89
2,892.48
1,985.41
1944
4,601.39
3,231.82
1,369.57
*344 Petitioner furnished automobiles used by its salesmen. When petitioner purchased a new automobile it gave the seller a check for the purchase price, which was used as its cost basis. Petitioner treated each automobile separately and apart from any other automobile. Petitioner depreciated such automobile on the basis of a useful life of 3 1/3 years. When petitioner decided to sell an automobile, it was sold for whatever it would bring. The sale price was applied to the undepreciated cost of that particular automobile and any excess was reported in full as income. This method of depreciating its automobiles has been consistently followed by petitioner since its organization in 1933 and has not been questioned by the respondent until the taxable years here involved. During the taxable years involved, petitioner's automobiles were usually sold for an amount in excess of the undepreciated value. Issue 3 Facts Petitioner was the liquidating agent of its predecessor, Holmes-Darst Coal Co. Petitioner advanced to that company money to pay its debts. In 1933 petitioner had advanced $41,462.96 in excess of the amount which petitioner collected as liquidating agent. At the time of its *345 liquidation the Holmes-Darst Coal Co. had a substantial deficit. The minutes of a special meeting of petitioner's board of directors, held on January 3, 1934, read as follows: "SPECIAL MEETING OF BOARD OF DIRECTORS. "Pursuant to the call of the President, a special meeting of the Board of Directors of Holmes-Darst Coal Corporation was held at #1318 Union Central Life Building, Cincinnati, on January 3, 1934, at 11:30 A.M. "Present: Calvin Holmes, Guy Darst, John R. Schindel. "Absent: E. P. Avent, St. John Reynolds. The Secretary presented the notice of the meeting, and reported that the notice had been sent to each member of the Board of Directors more than five days preceding January 3, 1934, pursuant to the provisions of the By-Laws. "The President stated that the meeting had been called for the purpose of considering the method of liquidating an advance of $41,462.96 which this corporation had been obliged to make on behalf of the Holmes-Darst Coal Company, for which it has been acting as Liquidating Agent, and called upon the Treasurer to make a statement. The Treasurer presented a statement of the accounts of Holmes-Darst Coal Company as of March 31, 1933, and Nov. 30, 1933, which *346 showed this corporation had advanced during the year 1933 the above mentioned amount of $41,462.96 in excess of the assets of the Holmes-Darst Coal Company which it had collected as Liquidating Agent. The Treasurer also stated that he had proposed to the officers of the Holmes-Darst Coal Company that the amount of such indebtedness be liquidated by the sale and transfer to this corporation of the 458 shares of the capital stock of this corporation which were issued to Holmes-Darst Coal Company in payment of the purchase price of certain fixed and working assets which this corporation had acquired pursuant to a resolution of its Board of Directors adopted on the 23rd day of May, 1933, and in addition a coal yard at Johnson City, Tennessee, which this corporation had agreed to accept at a value of $20,000 and that the difference between the value of the stock and the value of the coal yard and the amount of the advance, to-wit: $1437.04, be paid to the Holmes-Darst Coal Company in cash; that the officers of said coal company had accepted said proposition and that the transfer had been given effect upon the books of the corporation as of December 31, 1933, and asked that the Board ratify *347 the agreement. The matter was discussed, and the following resolution was presented, seconded, and unanimously adopted: WHEREAS this corporation has advanced for the account of the Holmes-Darst Coal Company the sum of $41,462.96 in excess of the amount which it has collected as Liquidating Agent for said Company, and has entered into an agreement with said Company for the liquiation of said indebtedness by the sale and transfer to this corporation of 458 shares of the capital stock of this corporation at a valuation of $50 per share and a coal yard at Johnson City, Tennessee, at a valuation of $20,000, the difference between the value of said stock and coal yard to be paid by this corporation in cash; NOW, THEREFORE, BE IT RESOLVED by the Board of Directors of Holmes-Darst Coal Corporation that the action of the Treasurer of this Company in entering into said agreement be and the same is hereby ratified and approved, and that said Treasurer be authorized to execute and deliver to said Holmes-Darst Coal Company a receipt in full for the amount of said advance, to-wit: $41,462.96, and he is further authorized to pay to said Holmes-Darst Coal Company upon receiving said stock and a *348 deed and bill of sale for said coal yard the sum of $1437.04. BE IT FURTHER RESOLVED that the officers of this Company be and they are hereby authorized and directed to take whatever steps may be necessary to execute whatever additional papers may be necessary in completely consummating and ratifying the agreement. BE IT FURTHER RESOLVED that said 458 shares of the capital stock of this Company received in partial liquidation of said indebtedness be carried on the books of this corporation as Treasury stock at a value of $22,900. "The minutes of the meetings of the Board of Directors held on the 23rd day of May, 1933, and the 10th day of June, 1933, were read and approved. "There being no further business, the meeting adjourned. "John R. Schindel "Secretary. "Calvin Holmes "President." The plan as outlined in the aforesaid resolution was executed at some undisclosed date. Petitioner had advanced to the Holmes-Darst Coal Co. the amount of $41,462.96 to pay indebtedness of that company, in order to maintain continuity of business and the good will of its creditors. It was these advances which were cancelled in the transaction outlined in the minutes of the directors' meeting *349 held January 3, 1934. The Johnson City property consisted of a coal yard of about 1 1/5 acres located in the heart of Johnson City, Tennessee. There were approximately $7,000 worth of improvements on the property, consisting of concrete walls, a concrete pier, a coal tipple and a railroad track. A wholesale and retail business center was on one side of the property and the larger part of the population of Johnson City lived on the other side. All the improvements on the property have become useless. Petitioner's tax return for the year 1944 contains a schedule headed "SALE - BUSINESS PROPERTY," which includes the following: Sold 12-8-44 Johnson City Real Estate
for
$ 6,000.00
Cost
20,042.40
LOSS ON SALE (To Page 16)
$14,042.40 The respondent disallowed the claimed deduction. Issue 4 Facts Petitioner, in order to facilitate its business, from time to time advances funds to various coal mining operators for whom it sold coal. Petitioner was not in the moneylending business and did not lend money for the purpose of receiving interest. The Berger Coal Mining Co., hereinafter referred to as Berger, one of petitioner's and its predecessors' sources of supply *350 since 1920, had worked out the coal seam it had been mining and had to go into another seam of thinner but high-quality premium coal. Berger had made money in all its years of operation, and had used it to purchase equipment and the land on which the mine stood. Petitioner advanced to Berger various sums of money totaling $74,000, to help it get started in the new seam. Petitioner believed these advances would enable Berger to maintain and increase its output. Berger ceased operations in 1944 when it still owed petitioner a balance of $14,000. On September 24, 1944, this account receivable was sold to Guy Darst and Charles E. Ralston for 260 shares of the common stock of Berger, having a fair market value of $2,500. On its Federal tax return for 1944, petitioner claimed a deduction of $11,500, as an ordinary loss sustained in the course of its business. The respondent disallowed the entire amount claimed. Petitioner sustained a capital loss in the amount of $11,500 on the sale in 1944 of an account receivable. Opinion The first issue involves the propriety of respondent's action in disallowing part of the amounts deducted by petitioner in its income tax returns as additions *351 to its reserves for bad debts for 1942 and 1943 and all of such additions for 1944 and 1945. By section 23 (k) (1) of the Internal Revenue Code, [1] the respondent is vested with a discretion in determining what constitutes a reasonable addition to a reserve for bad debts. Petitioner, therefore, has the burden of showing abuse of this discretion by establishing that the amounts allowed are not reasonable. C. P. Ford & Co., Inc., 28 B.T.A. 156; Apex Brewing Co., 40 B.T.A. 1110. The record shows that petitioner's accumulated reserve rose from $3,502.61 at the end of 1941 to $61,118.55 at the end of 1945. This large increase in reserve occurred although petitioner's accounts receivable (net) increased from $490,819.62 at *352 the end of 1941 to only $510,147.88 at the end of 1945, an increase of the reserve against total receivables from.648 per cent in 1941 to 10.425 per cent at the end of 1945. The evidence also shows that during the period 1942 to 1945 petitioner was able to select its credit risks more carefully. The charge-offs in 1944 and 1945 dropped to the amounts of $1,390.92 and $345.12, respectively, indicating that there were less credit risks involved during such period. We think the record clearly indicates that the amounts claimed by petitioner as additions to its bad debt reserve in the taxable years in question were excessive and unreasonable. Cf. Maverick-Clarke Litho Co. v. Commissioner, 180 Fed. (2d) 587, affirming 11 T.C. 1087. Petitioner argues that the formula used in the taxable years involved was used by petitioner and its predecessor to determine additions to reserve for bad debts and has not been disturbed by the respondent. Such fact is not determinative. C. P. Ford & Co., Inc., supra.What is a reasonable addition to reserve for bad debts depends upon the circumstances and conditions existing in the years involved, and not upon any *353 particular formula or method. Black Motor Co., Inc., 41 B.T.A. 300, affd. 125 Fed. (2d) 977. Therefore, we conclude that the respondent's disallowance, as additions to petitioner's bad debt reserve, of the amounts of $13,884.47, $1,401.06, $23,539.99 and $22,219.57 for the taxable years 1942, 1943, 1944 and 1945, respectively, was a fair and reasonable exercise of his discretion, and such disallowance is sustained. The second issue presents the question whether petitioner is entitled to depreciation upon its automobiles at a rate faster than the 20 per cent allowed by respondent in the taxable years 1942, 1943 and 1944. Petitioner, since its organization in 1933, has consistently used a 30 per cent rate of depreciation per year for its automobiles used by its salesmen. The respondent has reduced the rate to 20 per cent, thereby decreasing petitioner's claimed deductions for such taxable years. Section 23 (1) of the Internal Revenue Code provides for a deduction of "A reasonable allowance for the exhaustion, wear and tear * * * (1) of property used in the trade or business, * * *." Regulations 111, sec. 29.23 (1)-5, provides *354 that "The capital sum to be recovered shall be charged off over the useful life of the property, * * *. The reasonableness of any claim for depreciation shall be determined upon the conditions known to exist at the end of the period for which the return is made. * * * The burden of proof will rest upon the taxpayer to sustain the deduction claimed. * * *" The record shows that petitioner treated each automobile separately from any other automobile. When petitioner decided to sell an automobile, it sold it for cash. If the sale price received exceeded the undepreciated value, petitioner treated such excess as ordinary income. During the taxable years it usually sold its automobiles for a price in excess of the undepreciated value, and the respondent contends that such fact indicates that petitioner's rate of depreciation was too rapid. The tax years involved were during the war period when used automobiles were in greater demand and consequently brought a higher price. Since, however, petitioner returned the excess amount received as ordinary income, it is apparent that petitioner's method did not result in any ultimate tax benefit. Petitioner relies upon the respondent's Bulletin *355 "F," issued as a guide for depreciation deductions, wherein it is stated that a useful life of 3 years for cars used by salesmen is reasonable. While the bulletin has not the force or effect of a treasury regulation, it is presumably based on respondent's experience over a period of years. On the basis of this record, we are of the opinion that petitioner was justified in adhering to its customary method of depreciation of its automobiles used by its salesmen, and that the estimate of useful life theretofore adopted was not so patently inaccurate as to require a revision. We, therefore, hold that the respondent erred in reducing the depreciation rate claimed by petitioner to a 20 per cent rate. On this issue the petitioner is sustained. The third issue presents the question whether petitioner sustained any loss in 1944 upon the sale of a coal yard in Johnson City, Tennessee. On its return for 1944 petitioner claimed a deduction of $14,042.40 with respect to the Johnson City lot. The respondent disallowed the total amount claimed. The respondent contends (1) that petitioner has not established that a sale of the lot occurred in 1944; (2) that the adjusted basis of the real estate *356 in 1944 did not exceed the sale price; (3) that the basis used by petitioner has not been adjusted for depreciation allowed or allowable; and, in the alternative, that the loss, if any, was a capital and not an ordinary loss. Respondent's contention that petitioner has not established that a sale of the lot occurred in 1944 appears to us to be well grounded. Paragraph 5. (f) of the petition filed herein alleges: "5.(f) In its return for the year 1944 petitioner took a loss deduction of $14,042.40. This loss was sustained by petitioner through the sale of real estate used in its business. The cost to petitioner was $20,000.00 in 1933 and an additional cost of $42.40 thereafter, and the sale price was $6,000.00 in the taxable year. Respondent has denied the loss on the ground that, even though petitioner acquired the real estate at a cost of $20,000.00, its value was only $6,000.00 when acquired. Petitioner's cost was $20,000.00 and the value of the real estate was not less than that amount. Petitioner is entitled to the full amount of the loss deducted in its return." The answer of the respondent with respect to paragraph 5. (f) of the petition is as follows: "5 (f). Admits *357 that in its return for the year 1944 petitioner took a loss deduction of $14,042.40. Admits that respondent had denied the loss. Denies the remaining allegations contained in subparagraph (f) of paragraph 5 of the petition." In the opening statement made by counsel for the respondent at the hearing of this proceeding, he said: "As to the sale of the real estate in Johnson City the respondent awaits complete proof on this matter. We will concede nothing and we await complete proof on the matter. * * *" During the direct examination of one of petitioner's witnesses in connection with the issue as to the Johnson City lot, a discussion arose between the Court and counsel as to the matter alleged in paragraph 5. (f) of the petition and the respondent's answer. After examining the Court's file, counsel for petitioner stated: "Well, of course that amounts to practically a denial. It admits the petitioner took the loss but denies the facts alleged" to which the Court replied "Which you agree puts you on proof of the fact." Despite the state of the pleadings and the fact that petitioner's counsel had timely warning that the respondent was demanding complete proof and conceding nothing, *358 there is not one iota of testimony or competent proof that the Johnson City real estate was sold in the year 1944, or as to the consideration received by petitioner for the transfer of such property. In neither its main nor reply brief does petitioner attempt to establish the existence of the proof of the sale, other than by reference to its tax return, and the revenue agent's report which was put in evidence for the limited purpose of showing how the deficiency was computed. Neither of the documents relied upon by petitioner is competent evidence to establish that a sale took place in the taxable year in question. An essential and material element of proof to establish a loss on the sale or disposition of property is competent evidence that the sale or disposition actually occurred in the taxable year in which the deduction is claimed. Unless such fact is properly established, the loss is not deductible. In the face of the ample and repeated notice given to petitioner's counsel, we may not infer that the omission was inadvertent. Upon this record, we conclude that petitioner has failed to establish that it sustained a deductible loss in the taxable year 1944 with respect to the *359 Johnson City real estate. Therefore, we find it unnecessary to discuss the other contentions advanced by the respondent. On this issue the respondent's determination is sustained. The fourth issue presents the question whether petitioner sustained any loss in 1944 upon the alleged sale of an account receivable. On its tax return for 1944 petitioner claimed a deduction of the sum of $11,500, being the difference between the face amount of its account receivable of $14,000 and the 260 shares of the capital stock of the Berger Coal Company valued at $2,500. The respondent disallowed the entire loss. Petitioner contends that it sustained an ordinary loss in a transaction entered into for profit. We do not agree. Petitioner's account receivable was a capital asset. In 1944 that capital asset was sold or exchanged for stock which we have found as a fact had a fair market value at that time of $2,500. Petitioner, therefore, sustained a capital loss of $11,500, being the difference between the face amount of the account receivable and the fair market value of the property received. The amount of the capital loss which petitioner is entitled to deduct in the taxable year 1944 is limited *360 to the extent of its capital gains as provided in section 117 (d) (1) of the code. Maurice Levy, 46 B.T.A. 423, affd. 131 Fed. (2d) 544, certiorari denied 318 U.S. 780; cf. John F. B. Mitchell, 13 T.C. 368. Decisions will be entered under Rule 50. Footnotes
1. Section 23 (k) (1), Internal Revenue Code, so far as material, reads as follows: SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; * * *↩